Small v. City of Alexandria Alexandria Mr. Jordan Makett Good morning, Your Honors. Yes, sir. How are you? Doing fine. Good morning, Your Honor. Your Honor, this is a case that was ruled against the Goss children on the motion for summary judgment. In looking at the briefs and in looking at some of the more recent Supreme Court rulings, we feel that this case falls squarely and is very analogous to Toten v. Cotton, which is actually one of the cases cited by opposing counsel. In this case, Your Honor, we had Darnell Willis, who was the girlfriend of Richard Goss, called Acadian Ambulance. She did not call the Alexandria Police Department. She called Acadian Ambulance. And the purpose for that was Mr. Goss had been drinking. He had been heavily intoxicated. She needed some help to get him to the hospital. That was her goal. Now, let's stay within the record because you don't have any testimony from Darnell Willis. You tried to supplement the record here with an affidavit and that was denied. So you need to stay entirely within this record and don't tell us what Darnell Willis would have said in her affidavit. So if you're relying on something she told, the person she called, that's one thing. But don't not start telling us what she did unless it is in this record. That is perfectly fine, Your Honor. If you look at the statements of Russell Boney, Boney says he received a call from the dispatcher. Boney is one of the ambulance drivers with Acadian Ambulance. He said he received a call which showed that the actual voice call said it was a suicide call. But when he looked at his call notes, he said it was very interesting because he said the call notes specifically said, not threatening anyone, not threatening himself. And so he said, I found it very odd that they had it as a suicide call because, you know, the notes were clearly saying that he's not harming anyone, he's not harming himself. So he never was able to clarify that, but nevertheless, he went on to the Green Brow Motel, which is where Goss was staying at the time. Once they arrived, and here's where the first discrepancy comes in, where we think the lower court did not hold up to the standard, which was recited and told him that on summary judgment, the facts ought to be construed in favor of the non-movement party and all justifiable inferences therefrom. One of the things he said was, and this is Boney, that he saw Fairbanks knock on the door, Ms. Willis came out, they spoke for a second, and then she moved past. In Mr. Fairbanks' deposition, he says that he did not meet her at the door, that he meets her outside, somewhere further outside of the door. And by note in the judge's ruling, he puts Boney's statement as a footnote. So he does recognize it, but he doesn't use that as one of the facts that he uses in ruling for summary judgment. Excuse me. The other thing is, if you look at Boney, Boney says that at some point Fairbanks calls him in, and they go into the room, he looks around, he sees, he says that Goss is talking gibberish. And then all of a sudden he says, you know, you have to be aware of your surroundings. It's the only statement he says that you can clearly make out that Goss is saying. That Boney could make out. That Boney could make out. He said before that it was all gibberish. Of course, Fairbanks says that Goss says stay alert, stay alive, be aware of your surroundings. One thing Fairbanks says, Fairbanks says, and I think this is very crucial, that he at some point says he asks Willis, are there any weapons in the room? He doesn't say that Willis doesn't respond to him, so I'm not going to get into Willis's statement, but he says he does not hear her response. And on the further questioning, he comes back and he says, oh, you know what? I know why I didn't hear a response, because when I made that statement, I heard Goss say I got mine, too. Now, Goss didn't say that he had a weapon, because Goss is saying some other stuff, and he says coincidingly, he says Goss says I got mine, too. Ultimately, we know that there were no weapons in the room. What does double chevron man mean? Double chevron man, that is, and I didn't know at the time, but I found out that that is talking about your rank within the military. Corporal on the police force, they wear two stripes. That's right, double chevron man. However, Goss was in the military, as well, and had a rank of corporal. So if you want to construe this in a light most favorable to Goss, he could have been saying double chevron man, I got mine, too. Not in response to are there any weapons in the room. You don't make that argument in your brief, do you? That argument is made somewhere, Your Honor. If it comes from the record, you can argue whatever you want, but I thought he said you got your weapon, I got mine, too. I thought he prefaced that by saying you got your weapon. No, no, that's not. He says I got mine, too, not in response to a weapon, and in fact, again, Your Honor, the record clearly shows that there were no weapons in the room. That's clear. I understand that. And I understand. So here's a man who, according to Fairbanks, Fairbanks says he has no probable cause to arrest him. He is not called out for a crime. He's not called out for a criminal matter. He's called out to assist the Cayden ambulance in helping this man, assumingly getting him to the hospital. But when we question Fairbanks, Fairbanks says I had no reason to believe that he was committing a crime or that he had committed a crime. I had no probable cause to arrest him. The man was, in effect, in his home because that's where he had been staying, even though it was a motel, that was his place of residence. And the only thing he was was intoxicated. Your Honor, to me— What's this other testimony about he was tripping? Is that just what was in the inadmitted affidavit by Darnell Willis, or did someone else use that term about him? Fairbanks uses the term saying that Willis said that. Fairbanks says that Willis— All right. So what did Fairbanks say? Willis said he was tripping and drinking. And drinking. That's correct. And tripping is using drugs? Is that the common definition? No, that's not the common definition. What is it? Tripping is just that you're acting foolish. I mean, that's what tripping is. That's what you think the definition is in the dictionary? I don't know if there's—let me say this, Your Honor. If there were an urban dictionary, I can assure you that's what it would say. I don't know what Webster's would say is tripping, but tripping is not slang for using drugs. I'm pretty confident of that. So that's what he says, though, that he was tripping. And nor does Fairbanks say that he takes tripping as he was using drugs for that. But, again, here's a man not engaged in any criminal conduct, called out—someone calls, but the call comes in as a suicide call, but— Fairbanks didn't know that, though. Fairbanks knew it was a suicide call. He did? Yeah. He said he was—Fairbanks said he knew he was going over to assist in a suicide. Well, that's why he's worried about a weapon. He says he asked a question, but he says he never—if he's worried, Your Honor, then the person he asked the question to, he should get the answer for it. That's the problem. You know, the reason—and everybody's citing Tolan v. Cotton to us now, but the fact is that he kept telling the guy that the guy kept scooting toward another part of the bed, and then finally that he had his hands under the mattress, and the officer yelled out—this is undisputed— the officer yelled out to him at least four times, put your hands up. Nobody disputes that the officer yells out, show your hands, show your hands. However, Your Honor, the forensic evidence shows that when Mr. Goss was shot and killed, the bullet was at a downward trajectory, which only means that Goss was lower on a level of the gun angle than what Fairbanks was shooting, but it does show that he was upright and slightly leaned forward. It doesn't show that he was leaned over. It shows that he was upright and slightly leaned forward, and that comes from their witness. Your Honor, the truth of the matter is this. Just two weeks ago, we saw a man get shot in the back eight times, and the initial statement from the cops was that he was fighting over a Taser, and he dropped the Taser over there. It's just as plausible— You need to leave out anything but what's in this record. You start your brief by saying before Ferguson, before New York, before Ohio, there was Alexandria. You know, we're not here on a political issue. We're here on a legal issue. I understand that, Your Honor, and what I am saying is just to Judge Jones's statement that he heard, that everybody heard Fairbanks say, show me your hands, show me your hands. Nobody else other than Fairbanks says that he saw this man reach for a weapon. It's just as plausible— Nobody else was in the room. Your Honor, exactly. To my point, it's just as plausible that that could have been pretextual to him firing the shots because if you look at the forensic evidence, the evidence shows he was upright, slightly leaned forward. Not that he was bent over, but he was upright and slightly leaned forward. Now, does that mean that he was shot first and then fell over? Does that mean that he had bent over and came back up? He was already back in an upright position. I don't know, Your Honor, but if you're going to look at it in a light most favorable to Goss, it's just as plausible and just as justifiable as an inference in light of what we know police conduct to be that that could have been pretextual. We don't have video, and I know if we did, that would be great. But, Your Honor, I don't think the standard should be that if we don't have video— We'll look at the record. But, again, I can't find anything in your brief talking about the forensic evidence and him leaning forward, and that shows something, and you didn't file a reply brief. So, again, you can argue the evidence all you want, but issues are supposed to be raised in briefs. Your Honor, the issue is in a light most favorable to— I understand the issue. I'm very familiar with summary judgment. And I understand. And Boney says when he's in there, Boney says this man isn't—Boney goes into the room. Boney says this man isn't threatening anybody. What do you want to do with him? And that's in the brief, and that's also cited by opposing counsel. Well, there is definitely—I mean, before you didn't agree with me on this, but at some point we have a quotation from Goss where he says, You got your weapon, I got mine, too. That is part of what Mr. Fairbank says. He's saying, I got mine, too. He assumes that was to the weapon. He says, You got your weapon, comma, I got mine, too. Now, Fairbanks may be lying or misremembering, but that's what the testimony is. Your Honor, I understand what you're saying. In light of the actual evidence that there was no weapon, then the inference to me is that he isn't speaking to that. Nobody's not saying these aren't tragic cases, but there are at least two other cases on our court where the police shot fellows dead because they didn't raise their hands or they did have their hands down where the police couldn't see them, which in circumstances that appeared to create a great threat. And they get qualified immunity because, you know, are they supposed to risk their lives? Your Honor, he never made any overt threats toward anyone, not only Corporal Fairbanks. He never made any overt threats toward anyone. If he said, You got your weapon, I got mine, too, wouldn't you agree that that would raise a justifiable suspicion of a threat in the police officer's mind? Your Honor, I wouldn't necessarily say that because the point is he is in effect in his home, and what we have is a man in his home, and if it's illegal for him to have a weapon in his home, I could understand that. But that's not the case here. The man is in his home. He is not causing harm to anyone. Clearly out of his mind with inebriation of some sort. He is. Then he, you know, says he has a weapon. I mean, it's a troubling situation. Well, Your Honor, the only thing I would say is when you have a situation where a man is in his home, he's not causing harm to anyone, the only call was for even to giving them the benefit of the doubt, somebody that was suicidal, in need of medical assistance, that the EMS attended is saying, He's not threatening anybody. What do you want us to do with him? At that point, maybe they should have just taken him to the hospital, and this could have been avoided. We have your argument. It's time for rebuttal. Thank you. You have time for rebuttal. Mr. Calvert. Good morning. May it please the Court. Brad Calvert here on behalf of the city of Alexandria, former Chief Darren Cootey, and Detective Clifton Fairbanks. Well, Fairbanks is the only one left in this case, isn't he? I believe so, Your Honor. That's one of the arguments. Yes, sir, Your Honor. One of the arguments we made is that he's waived all other claims. He's only here on the excessive force claim against Fairbanks. That's correct, Your Honor. All right, Officer, Fairbanks was dispatched based on information from Acadian Ambulance of a suicidal individual. Fairbanks, following standard operating procedure, drove to the location, which is the Greenbrier Motel. Upon arrival, Fairbanks saw that the EMTs were already there. Fairbanks then gets out of his car and begins to go to the room from which the call emanated. There's a slight discrepancy, although not material, that the witness, Ms. Willis, comes out of the room. It's not disputed that there was a conversation between Fairbanks and Ms. Willis. It's a discrepancy between Boney, who thought that this conversation occurred at the doorway to the room, and Fairbanks, who testified it was further out. It's a discrepancy. It's not material. That's when Willis told Fairbanks, it's not me, boo, it's him, and he's tripping. Fairbanks continues on his mission, which he believes is to prevent a suicide. That's what he was there for. He entered the room. Now, in the brief that was submitted, there was an argument about the entry into the room being illegal or unconstitutional, and I believe, Judge Prado, you had two cases. The initial one, the Rockwell case, granted qualified immunity in similar circumstances, and then Rice came behind that and said no, that it is now established that a police officer can make an entry into a home if there's a genuine belief that someone's in danger from himself. So Fairbanks, in compliance with the law in his duty, makes entry into the motel room. That's when he sees in the darkened room Mr. Goss. Mr. Goss begins exhibiting signs, and during the discussion, Fairbanks learns information that leads him to believe he's inebriated. And so at the beginning of the session with Mr. Goss, suicide, tripping, and then Fairbanks develops information that he's also intoxicated. And so it begins to ramp up, or the heightened sense of urgency begins. I acknowledge that at the beginning of this session, which lasted about two to three minutes, there weren't any threats. At the end, after it had escalated, that's when Fairbanks believed his life and the others' lives that were in the area were at risk. That's when Mr. Goss blurted out, I've got mine right here, and begins to move forward with his hand passing the edge of the mattress. That's when Fairbanks fired his weapons. The two other eyewitnesses were outside the room. Sergeant Raschel had pulled up to back up Mr. Fairbanks or Detective Fairbanks, and he gets out right at the end of this call and contact. And he hears Fairbanks call out something to the effects, show me your hands, raise your hands, something of that nature. That's similarly echoed by Boney, who's outside the room and somewhere in, I guess, a better position of safety. And so the only eyewitness after the incident is Fairbanks. The things that other people could see, they testified to in the depositions. And so those individuals corroborated different portions, almost snapshot. The other individual that offered evidence was Boney, wasn't it? Boney and Raschel. Sergeant Raschel was the responding officer who pulled up to back up the initial responding officer. And so, again, Raschel gets there, and he's not aware of what may have transpired before that. But Raschel says he gets out, and he describes the very probably last 10 or 20 seconds of the incident. When the shots are fired, Raschel then comes behind the officer Fairbanks, taps Fairbanks on the shoulder, tells Fairbanks, I've got it. Fairbanks leaves the room, and then Raschel does the sweep of the room looking for the weapon that everyone believed was there. In other words, Raschel believed it was there based upon the comments made by Fairbanks, and Fairbanks certainly believed the weapon was there or he wouldn't have done what he did. And after Raschel swept the room, he found no weapons. And so those are the facts that we have. Certainly there are things you can pick out. The words that Boney heard are slightly different than the words that Fairbanks reported that he said. But Boney did say four or five times Fairbanks called out, either show us your hands or put your hands up, something of that nature. And so you have these two other eyewitnesses who corroborate the matter as it's moving along fairly quickly. And to think that, first of all, it's not in the pleadings, it's nowhere, that Fairbanks would come up with this pretext, under these facts and circumstances there's no record evidence of that. There's no bullet tracks going into individuals. You say there's no forensic evidence in the record? I'm not sure if the autopsy was put in at summary judgment. I don't recall that. That was the only forensic evidence, so to speak, that there would have been. It's certainly not in the brief of either party, and it wasn't referenced by the trial judge in reaching his opinion, whether it was submitted, I just don't recall at this time. And so to say there is some kind of forensic CSI-type issue out there, there's simply not. And certainly the dynamics of someone moving around in the room, and I think Fairbanks explained that he fired shots, he fired two shots and he was moving. Boney said the Fairbanks fired two shots and seemed to be taking cover at the edge of the doorway. And so you're going to have several dynamic actions. You're going to have the suspect moving in whatever fashion he was moving, and you're going to have Fairbanks moving in whatever fashion he was moving. And certainly there was no expert that came in and did anything to try to track bullet paths. Now, getting back to the Fairbanks version of what occurred. Yes, it is. Willis's statement isn't in the record. We got a little bit about he's intoxicated and tripping. That's what we have. But when the incident actually happened, all we have is Fairbanks' version of what happened, and Boney's statement supports Fairbanks' version of what happened. Boney's deposition was taken, and Rachelle's deposition was taken. And Boney is very, very careful if you look at his deposition. I'm not sure which of the plaintiff's attorneys asked the question, but they asked several times, did you see the gun? In other words, did you see Fairbanks' gun? And Boney carefully said no, but I saw his arms in a fashion pointed forward. There's a door frame. And so from whatever angle Boney was watching, he couldn't see the weapon. But he saw Fairbanks' arms extended as if they were a weapon, and he reported what he remembered Fairbanks said in the way of instruction verbal command. And there's certainly a little difference between what Fairbanks said he said. I'm not sure if Fairbanks said show us your hands, show us your hands. But Boney also recalls words of that type. Get your hands up, I think Boney may have said. So Boney's testimony supports Fairbanks' version of what occurred. Right. It corroborates it from his viewpoint. And then Raschel also corroborates, again, the last 10 or 15 seconds. He gets up right at the end, just before Fairbanks begins firing his shots. And so to the extent there are witnesses, those witnesses corroborate the critical issues. Now, whether there was some discrepancy about what happened at the beginning, there is no evidence at all, and the district judge says that in his opinion. There's no evidence at all that shows any dispute relative to the last moments of the contact. In other words, the words exchanged and then the movement inside the room, there is no evidence that disputes Fairbanks' reasoning and Fairbanks' actions. And so to the extent it can't. Well, and there is a question about the third shot. Two shots immediately, boom, boom, and then a delay. Right. And, again, I mean, a delay, that may be a dispute, but it's immaterial. Whether there were bang, bang, bang, bang, bang, bang, when people are describing those dynamic actions. There doesn't seem to be any disputes. There were two shots immediately, boom, boom, and then a pause, and then the third shot. And I think Fairbanks agrees with that. Right. But when you say a pause, I mean, to someone that's hearing it right now, a pause could be two seconds. And so to say that there was a pause, there's no evidence about the length of any pause, but it was all quick. Again, knowing this is evidence, that issue wasn't raised by plaintiffs, was it? No, sir. Do you think that there's some significance about the pause? No, sir. No, sir. Because in the view of the evidence, if he believed reasonably, if Fairbanks reasonably believed there was a weapon, it's his obligation to stop the threat. And whether it takes one shot or five shots, you have to stop the threat. And so whether, and there's no evidence about whether the first shot was deadly or not. There's no evidence whether the third shot was deadly or not. We know three were fired and two struck the subject. The sequence, we don't know. He was how far away from Goss when he shot? The length of the bed plus a little. It was no longer than 10 to 12 feet. In the deposition testimony of Fairbanks, he started off 4 to 5 feet from the subject. The subject then moved away from Fairbanks the length of the bed until he got to the headboard. And so the entire exchange from beginning to end was from 4 feet to 12 feet. The bed was sticking out in the middle of the room or was it near a wall or something? Within the deposition testimony. Is there a diagram anywhere? I'm trying to think within the record. I don't think there's positive evidence to that effect. I think if you read the deposition of Fairbanks, the sense you get it was against the wall. Your standard motel, hotel room. And so I don't think that there's testimony that says the headboard was directly against the wall. But I think if you read the deposition, there's a general description about a table and a lamp and some other things. And I think you can gather from that. And I believe Rachele also, when he cleared the room, I think there's some testimony in Rachele's deposition where he describes what he saw as he cleared the room. So getting back to Toland. If you look at Toland, and I know Judge Barksdale, you wrote Toland 1. It went up, came back, and then a little later this court also had Thomas v. Nugent, which was the Taser death case that came out of the district court in Alexandria. The same judge that ruled on this. It came through here, then it went to the Supreme Court, and they reversed that case as well and said, consider that case in light of Toland. And looking at Toland, when we discussed it in brief, the application of Toland does not change the outcome in this case. And in Toland, I think the Supreme Court focused on what I describe as two streams of fact. In this case, there's only one stream of fact. And so if you look at Toland and apply it to this case, Toland will not affect the outcome. Now, certainly the decision on the summary judgment predates Toland, but it applied Anderson, which Toland relies upon. And so to the extent of qualified immunity analysis and or the Fourth Amendment analysis has been made, Toland doesn't change that. And in particular, in the judge's ruling on page 1332, here's what Judge Drell said. Plaintiff asserts no facts contradicting Fairbank's statement regarding Goss's actions prior to the shooting. And so in looking at Toland, it doesn't apply to change the outcome. There aren't two streams of facts at issue in this case. There's one. And it's Fairbank's testimony corroborated by Boney and Rochelle. Then it goes on. Plaintiff argues there was a factual dispute. However, Plaintiff does not provide any evidence to create a genuine dispute about whether Goss made military and weapon-related statements. And y'all, excuse me, judges, y'all remarked earlier that those kind of statements were made. The Plaintiff's attorneys agreed that Mr. Goss did have military training. So the suspicion that Fairbank's had, as described in his deposition, was that the man had military or police training, which turned out to be true. And so the suspicion that was generated or the belief that was generated by Fairbank's or in Fairbank's mind was based upon the statements and the actions. Double chevron man. You've got to watch your situation. I'm not sure the exact terms, but things of that nature that Fairbank's recognized from his term in the military. All right. Then right here. There's no issue that Goss made military and weapon-related statements or about whether Goss refused to follow Fairbank's commands. You remarked about a couple of cases that showed leaning down and grabbing something perhaps. And I think Mannis is the case you were thinking of, one of the cases you wrote up, I believe, Judge. And in that case refused to follow repeated verbal commands. And the suspect does things, in this case subject, does things that lead an officer to believe he's arming himself. The mere fact that there wasn't a weapon found later doesn't change what Fairbank's reasonably believed under the circumstances presented to him at that time. Let's see what else. The pretext, there's nothing in the record about pretext. If he were there when Fairbank's deposition was taken, he was a fair and truthful man, and you can tell that from his deposition. I know. But they were there, and I was there. And Fairbank's told the truth, and he responded to what he believed was a genuine threat to his safety and the safety of the other people in the immediate vicinity. Thank you for our tape of this argument and to assist the panel. The day that plaintiff filed its brief here, mid-December 2014, it filed a motion to supplement the record with the affidavit of Darnell Willis. And in its brief, pages 10 to 11, asked the Court to allow that motion to be supplemented. Of course, an oral argument panel can overrule a motions panel ruling, single-judge ruling. The motion to supplement was denied, but before it was denied, you filed, or when I say you, the city filed a response to the motion to supplement. Just give us a summary of why you felt this Darnell Willis was certainly available well before the date claimed by plaintiff for getting her affidavit. As soon as we saw the motion to supplement, now backing up for a moment, the presence or absence of Darnell Willis was addressed years ago in various discovery disputes. And I believe at one point, the magistrate judge, or perhaps Judge Drell, I'm not sure who made the ruling, said, you need to come up with where Darnell Willis or all your witnesses are in six months. And they never did. And so when the motion to allow the filing of the affidavit at the Court of Appeal came in, we learned that she was in federal custody, or had been. We went and pulled, I went and pulled Pacer and read through the entirety of the two criminal matters that I could find that she played any role in. And in the opposition that I filed, I detailed where she was. She was released to the custody of her mother for months in Louisiana that she absconded, got remanded to custody. She was re-released. She was corresponding with attorneys in central Louisiana. And so we felt that now whether Ms. Willis' hype hit herself, I don't know. But in looking at the record, it was evident that Ms. Willis was out in the free world and not in a federal prison for much of the two or three years that was at issue. And so we felt in just reviewing what we had available to us under Pacer that had a diligent inquiry been made, then Ms. Willis could have been tracked down. It took us, once we knew that she had been in federal custody, minutes to pull the record and find out she had been in correspondence with Senator Don Kelly from Natchitoches, Louisiana, seeking to have him intervene to lighten her sentence in the federal matter. All right. So I believe that the court was correct. The single judge that ruled on the exclusion was correct for the matters, for the facts that we sat out together with the established law, that you can't show up at court of appeal with surprise evidence that's carefully tailored to attack the summary judgment that was granted in 2013. All right. So getting back, I think the district judge looked at all the evidence. I think all the evidence is now before this court. I believe when the court, I know you don't like believe, but when the court reviews the pleadings and the record, it will show that the district court was correct in granting summary judgment. Summary judgment should have been granted, as I call it, on the merits, that there was no Fourth Amendment violation. If it is determined there was a Fourth Amendment violation, then qualified immunity is still allowable to prevent liability against Fairbanks for the actions he took that day. When I read the district judge's opinion, it seemed to me he ruled on the merits, by ruling on the merits, for summary judgment purposes. He addressed excessive force. He didn't expressly address qualified immunity. I know you raised it, and we can certainly look to any issue raised by either side in the record. Well, Judge, when he released his opinion the first two or three or four times that I read it, I believed exactly what you said. But then the last line of his opinion on page 1332, it says, therefore, Fairbanks' actions were reasonable under the circumstances. And then he says, and objectively reasonable under clearly established law. Well, he uses that earlier in talking about excessive force. Right. And so I initially thought it was on the merits. Then, in reading it more closely, I wasn't sure. But the case law says that summary judgments can be granted on any basis that's within the record. And so if the court decides to move away from what I call the merits and address qualified immunity, the Fifth Circuit case law allows that, I've raised it, and the judge makes an oblique reference to it in the district court ruling. All right, we have your argument. Thank you very much. Thank you. Mr. Jordan, your turn. Thank you, Your Honor. I'd like to just address this last issue of Darnell Willis, Your Honor. He says once we knew she had been in federal custody, it took us one day. The truth of the matter is, the only way he knew she was in federal custody is because we raised it in our motion to supplement the record. Before that, no one really had any idea or any reason to believe that she was in federal custody. It was only later on that we found out that she had been in federal custody. And once we found that out, we tried to make contact. We contacted a probation officer, and then long story short, we were able to find her. And she was really in Baton Rouge. She had been there for about a month or two. But at no point during the whole time we were going through this did we know or have any reason to believe that she was in federal custody. We had been looking for her. Mr. Heron, I say we. Mr. Heron and I had been looking for her, could not find her. The few people we had, at one time we made contact with her sister, who only would tell us that she was in Texas, but did not say that she was in federal prison or incarcerated. Now you're testifying. That's not in your motion to supplement. I apologize, Your Honor. I'm only addressing the fact that there was no reason to believe that she had been in federal custody, and she could not be found. That speaks for itself. One thing, Your Honor, and Mr. Calvert was very clear in this, and he talked about some of the other cases. He said the suspect, he said in this case the subject. And I think that's very important because here we're not talking about a suspect. We are talking about a subject because there was no criminal activity. There was no criminal activity going on at all. I just, if I could for a minute, read exactly what Boney says. And this is from Mr. Calvert's brief. He quotes Boney. And then he says, Boney is saying, and so this is page 14 of Mr. Calvert's brief. Starts at the top, it starts to answer. It says, which was actually near the outer wall of the hotel room. And he says, and so Officer Fairbanks was standing there watching him, and I kind of leaned up against the wall, the door facing, and I asked him. I said, well, man, y'all, what are y'all going to do with him? I said, he's just drunk, you know. He's not threatening anybody. I don't know, you know, what I can do with him. He said, well, I got a supervisor on the way. We're going to wait until he gets here to see what he wants to do with him. I said, well, okay. He says he's not threatening anybody. Now, if you go further down there, he does mention the thing about he says he saw him extended from a weapon. That is not in dispute. But, Your Honor, to the question or the statement made as to Fairbanks saying that Goss says, I got my weapon too. He says that, and I went back and looked because I wanted to look and make sure while Mr. Calvert was talking. On page 170, line 13 through 16 of Mr. Fairbanks' deposition, he does say that, I got mine too. But that conflict, that's a direct conflict with his statement on page 135, line 11 through 13. He never says, I got my weapon in his initial statement. He never says that Goss says, I got my weapon too. He says, I got mine too. He never makes reference to the weapon. It's only later on on page 170 that he makes this conflicting statement, and he says, yeah, I got my weapon too. Those statements are conflicting based on Fairbanks' own testimony, and if that's going to be construed in the light most favorable to Goss, I think we'd have to go with the statement on 135, line 11 through 13, when he only says, I got mine too. And he's not making any reference, nor does Fairbanks say he's making reference to a weapon at that point. Again, Your Honor, just in brief, we have a situation here that's slightly different than Toland, and the fact that in Toland, the officer reasonably believed that the call was stolen because he mistyped one digit for the license plate. Here, we don't even have that. It's clear that Fairbanks says that he had no probable cause to arrest Goss. He didn't think Goss was engaged in any criminal activity, and if you read throughout his deposition, he says, I never had probable cause to arrest him. You have a man, in effect, who is in his home, at best suicidal, if you believe their version of events, that he was suicidal, but certainly wasn't threatening anybody, wasn't trying to harm himself, and because, if you take what they say, made a sudden movement for what Mr. Calvert says that Fairbanks says, believe was a weapon, that he was killed. Thank you, Your Honor.